Good morning, your honors. My name is Barry Gomburg. I represent Mr. Sardiga. Gomburg. Your name is, sir? Barry Gomburg. Mr. Gomburg. Thank you for the opportunity to be here. I apologize for my voice. I'm just trying to get over a cold. Your honors, succinctly, we are asking this honorable court to decide whether an employer who lies, misrepresents, and fraudulently conceals information to an employee, complaining of illegal activity, can thereby shield itself with impunity in order to avoid the effects of the Illinois whistleblowing statute. We are respectfully asking this honorable court to consider the very real human dynamics that occur in the workplace. And that occurred, in this case, between Mr. Sardiga and Northern Trust and the person of his boss, basically, Tom Hines. We are only appealing the lower court's decision of what constitutes a refusal. We are only asking this honorable court to determine whether plaintiff's actions constituted, quote, a refusal, unquote, under the Illinois whistleblowing statute. That was the only subject of our motion to reconsider. It's the only subject about which Judge Gomburg permitted us to appeal this matter, which was joined in by the defendant. We believe that the lower court did not recognize that we, in fact, did assert in our response to the motion for summary judgment that plaintiff had, in fact, and de facto, refused to participate in illegal activity at Northern Trust. Again, that is the only issue for which Judge Gomburg granted the request so that we could be here today. Lower court decided, as you know, that there were material issues of fact concerning the issue of whether defendant, Northern Trust, discharged Mr. Sardiga for retaliatory reasons. That's why count one remains, and we were about to go to trial before Judge Gomburg allowed this appeal. Both the lower court and both parties could not locate a definitive court decision on this issue, and we are respectfully asking this honorable court to make that decision. Well, Mr. Gomburg, excuse me for interrupting. Sure. But it appears to me that we have a statute which is not ambiguous. It's pretty clear on its face saying that there has to be a refusal to participate. And can you tell me where in the record, or in any of the documents within the record, that there is conduct on behalf of Mr. Sardiga where he refused to participate? We know he complained. I'll be happy. And he confronted his superiors. But where and when did he fail to participate or refuse to participate? I'd like to answer that question, and I'll attempt to do that, Your Honor, in a number of ways. First of all, he refused to put private confidential information in what Northern Trust calls the contact management system so that anybody could have access to that information. For example, there was one of his clients that in doing financial planning, Mr. Sardiga learned that that client had what they called, excuse the language, but it's not my language, a bastard son. And they didn't want to put that language in information so just anybody could know about it. Mr. Sardiga, that's just an example of one thing that Mr. Sardiga refused to do. The second thing that I can point to is that he refused to participate in distribution of literature, marketing literature that Northern Trust passed out to clients and prospective clients that he thought was not only misleading but even fraudulent, and he complained that that was illegal. He also refused to recommend products that the clients would then have to pay a fee for without knowing that they would have to pay that extra fee. So he didn't want to participate in misleading and fraudulently telling clients you can buy this product without also disclosing that they had to pay an additional fee. And respectfully, Your Honor, we're also asserting in our brief and in our argument here today that in de facto, by the lies that Mr. Sardiga heard from his boss about what was legal and what was not legal, whether he checked with legal, whether he checked with compliance, and every time Mr. Sardiga complained, Mr. Hines said, oh, I checked it out, it's okay. And so after a while, he was assuaged by that language, by that representation, which turns out that's a material issue of fact, whether it occurred or not, because we have deposition testimony from Wes Ringo, who's the chief compliance officer at Northern Trust, who says in part that Mr. Hines never checked that out with me, and I never told him this answer, which then Mr. Hines presented to Mr. Sardiga, which put Mr. Sardiga off for the moment. And that's why during that period of time when he was being lied to, he didn't actually say I'm not going to do this and take the chance, as I was suggesting earlier, that he would be fired for it. But at the end, and it was a short tenure, just about a year, he said in December of 2004, I'm not going to accept your representations anymore, I'm not going to accept your lies, and I'm going to go to the NSAD and I'm going to blow the whistle. Shortly thereafter, he gets fired. So, Your Honor, I hope I answered your question. But besides actual refusals, not doing things, which I think is the definition of refusal, and just in case I brought my very old Merriam-Webster dictionary, because we don't have, at least the court and the parties were not able to find an actual definition of what the word refusal means, the Webster dictionary that I have in front of me, and I'm not suggesting this is something I can cite as precedent, but it says, in part, the word refused, the definition is to decline to accept. So we're maintaining, Your Honor, that Mr. Sardica declined to accept the representations that what the bank was asking him to do was legal. Also, does that suggest there's communication from the person who thinks it's either illegal or not? I didn't hear you. Does that suggest there's communication of this person's refusal if they decline to accept your definition? Should that have been communicated every time there was a question? I'm not sure that it has to be every time, but it certainly, in this case, it was communicated a number of times, as I indicated to Judge Harris, that there were times when Sardica said the actual words, I'm not going to put this information into contact management because it's going to violate the privacy of my clients, or I'm not going to distribute this literature because it's fraudulent, it's misleading to clients, or I'm not going to recommend certain products where clients are not told that they're paying an extra fee. And then at the end, as we suggest, he actually says the words, I'm going to go to the NSAD, and before he gets a chance to do that, he's fired. Well, the way that he put information in that management system, the management system itself was not an illegal activity. These other suggested refusals to participate were not in and of themselves illegal activities. If I may address that, Your Honor, the management contact system is not in itself illegal, you're correct. And your own client, from the reading of the records, he concluded it wasn't illegal and that it was just probably a poor business practice. Well, he actually concluded that the use of the system was illegal. It was in a violation of what the agreement was with the client and it was a violation of their privacy. Okay. And under the Act, not only do you have to show the refusal to participate, you have to show the activity to be illegal, and third, that your client was fired because of the refusal to do that particular thing. That's correct, Your Honor. Can I address that, if I may? You may. I know you know this, but I'm going to just say it anyway. The defendant, for the purposes of this appeal, noted that they are not disputing whether any of the activities that Mr. Sciarica complained of were illegal or not. So they're, I mean, it's obviously up to the court, but from the defendant's point of view, they're taking it off the table and saying, for the purposes of this appeal only, we're not saying what Mr. Sciarica complained of was not illegal. They're basically admitting that it is illegal. From the point of view, what was the second part of your question? I'm sorry. Well, there was the second part, but I said then that he was fired for that illegal activity. I'm sorry. Okay. Again, the lower court said, and I know you know this, I don't mean to repeat it, but that there was no material issue of fact. That's why count one survives as to whether or not Mr. Sciarica was retaliated against. The only issue that would remain after all the motions and all the arguments, motion to reconsider and so forth, that I believe, that we believe are remaining, is the issue of what is the definition of refusal. The court made it pretty clear, at least to us, in his decision, that there is a material issue of fact as to the real reason why Mr. Sciarica was discharged. And there's disputed facts on both sides of the aisle, so to speak, on that, Your Honor. So that's why we believe that the discussion here, and, of course, that's just our opinion, you may have a different opinion, is that it is a narrow question of what is the definition of refusal. Are you saying, correct me if I'm wrong, Your Honor, are you saying that, in essence, his constant commentaries to his supervisor and or other people there at the bank, this equals or is in place of or can be considered refusal? In part, Your Honor. But we're also saying that, if I may just comment on that and then continue in my answer, as you know, this was not just a one-time complaint. It was constant from the first time he got hired to the last day that he was fired. So we didn't count how many times he did it, but it was constant. And what we're saying is, if he had not been told by his boss, and in the workplace, if I may, because I used to be a human resource director, so forgive me for this, but it just seems to me that we need to recognize the actual reality of someone working for someone else. That it's not like we're friends and I can say to you, you know, I'm not going to do what you're asking me to do, Joe, because what you're asking me to do is illegal. What he did was, as you suggest, Your Honor, constantly ask Mr. Hines, this is the problem, I don't want to do this because I could get in trouble, we need a license, the SEC says we need licenses, and all these other complaints that the record reflects. And every time the record reflects, Mr. Hines said, it's okay, don't worry about it. I've checked it out, everything's okay. So in the workplace, what's an employee to do? Well, besides continue to ask his boss, he also went to human resources. And they said talk to Mr. Hines about it. Essentially, they didn't say it this way, essentially it's not our problem, deal with Mr. Hines. So where was he supposed to go? If he goes around his boss, let's say to the president of Northern Trust, his career is over. It's like committing suicide. He's got to rely on his boss, and he's making constant questions. If it was one time, maybe not. But it was so many times over the period of his short tenure that, yes, that's our argument, Your Honor, that the fact that he was refusing, besides the reality of what he actually refused to do, he also didn't say the words, I refuse, until the end. And part of that was because he was told it's okay. So we believe this boss, we believe the reality is, and the law should reflect, that you've got to trust your boss. Otherwise, what kind of situation do you have? And if your boss lies to you, which there's definitely a disputed issue of fact here about that, what's the employee supposed to do? So finally, he just says, I've had enough, I'm going to go blow a whistle, I don't believe you anymore. And shortly thereafter, he gets fired. I'm looking at my notes because maybe I've covered it all, and I don't know if I've answered all your questions, but I think, basically, I think, Your Honors, I think I've probably covered it. Thank you very much. Good morning. May it please the Court. My name's Ed Jepson, and I represent the Northern Trust Company. Counsel. In the interest of disclosure, I'll tell you I have a checking account with the Northern Trust. You know, I cannot tell you how happy I am that he said that because me, too. Now, I, in the interest of, I don't know, I hope nobody has a problem with that. I do not.  Thank you, Your Honor. The background facts here are very simple in a lot of ways. In the sense that the plaintiff was employed for 10 months by the bank as a financial planner. During that time, he managed to rack up many customer complaints, client complaints, partner complaints, got a final warning, and was fired. Why we're here is there's a dispute as to why he was fired. Obviously, plaintiffs say it's because he raised these issues of violations of what he believed to be violations of law. And this appeal, Mr. Gombrich is right, is with respect to the court's ruling below that Mr. Sardega, as to count two of his complaints, failed to satisfy the requirements of the Illinois Whistleblower Act, which states unambiguously, we believe, that it protects people who go to an agency, go to a court, and report things. In other words, go outside the employer and report things. And the judge found nothing there. And Mr. Gombrich and plaintiff are not arguing that he did that. And then the other prong is that he refused to participate in activities that would violate the law and was fired because of it. The lower court, in his opinion, both on summary judgment as well as the motion to reconsider, said he scoured the record and found no evidence of refusal. And we will submit, despite the creative arguments of my opposing counsel, that the lower court was right. There was no refusal in this case. Indeed, if you look in the very beginning of the brief, the issues presented for review, not whether refusals to enter things in contact management or refusal to recommend product or refusal to distribute literature are enough of a refusal under the Act. It says whether a supervisor's misrepresentations preventing somebody from going and refusing is enough or whether relentless questioning or complaining is enough. So I submit, we submit to this court, that the three things mentioned as refusals were not contemplated, were not raised below, and indeed really aren't refusals within the Act. And I'll address them. First, contact management. As the court recognized, this is a business system. It lets the bank and bank personnel know when appointments occurred, know generally what was happening with clients because many of the clients have multiple relationships within the bank. What happened here and what the record states is not that Mr. Sardega refused to put things in the system. What it states is he had concerns, as did a number of his fellow financial planners, about putting some things in the system. And so what happened? What does the record say? He, along with the other financial planners, came up with a system which his boss knew about and allowed to indicate that confidential information was contained in a file. That's what the record shows. As to the distribution of misleading or fraudulent material, the record doesn't show that. What the record shows is that Mr. Sardega and a number, again, of his fellow planners, did not like the wording, did not like some of the statements that were in the materials. So what did they do? They went to the person who was responsible for producing that material and said, we'd like to change it, we'd like to amend it. And they did, without repercussion. There's nothing in the record that indicates anybody had a problem with any of the changes. Indeed, the changes were accepted. And they used that material going forward. As far as recommending, not recommending Northern Trust product, again, we believe this is just another attempt to invent a refusal where none occurred. The record is very clear that financial planners were to provide objective advice and were free and did recommend products at the Northern and outside the Northern. And indeed, a number of the financial planners said they didn't really recommend many Northern products because they thought there were better Northern products out there. I'm sorry to say that with my client here, but that's what the record shows. So there's no refusal there based on any violation of law. He was doing his job, recommending the best products he could. And he testified that he never recommended products just because he was being pushed to do so. He said he did what was right by his clients. So we dismiss those refusals. We don't believe the record shows any refusal. So the real question comes down to, should this court, in my view, in our view, impermissibly expand in a tortured, we believe, really contorted reading of this very simple wording in the statute beyond it to say that relentless questioning means refusal? No. Relentless questioning is a common law tort under retaliatory discharge, which is still here. There's a remedy for that, and it's still available in Count 1. And with respect to lies, misrepresentations, et cetera, again, we in great detail, and obviously I don't have the time, nor do I have the mental capacity to go back and give you verbatim where we've dealt with those issues, but we're not in any way acknowledging that that occurred. Indeed, we believe the record shows very clearly that it didn't occur. But in any event, if this court were to expand this statute in some way to say, you know, under certain circumstances we'll say there's a refusal even when there's not a refusal, how is anybody to know what the statute means? Where do you draw the line? Refusal has a very simple definition, a dictionary. Mr. Gomberg has it. He can read it to the court. Mr. Sautiga did not refuse. The statute the legislature drafted was drafted narrowly. We submit for a purpose. You have to refuse. He did not, and relentless questioning or supervisor telling him everything's okay so he doesn't refuse, it's not enough because it would, in essence, involve this court doing the legislator's job and adding prong two or three or four or five in the statute when it's very narrowly and unambiguously drafted. We also submitted as an alternative, as we mentioned in our briefs in great detail, that indeed as an alternative, and this court's looking at this de novo, we believe that the record shows very clearly that there was no retaliation here as well. Indeed, what the record shows is that in March there was a mistake with respect to a McDonald's presentation. In May there was poor judgment exercised with the use of or accusations of mistakes by human resources, which another northern person who was there complained about or at least said I was very, very disappointed in his poor judgment. We have him showing up late to a client meeting and again other northern partners there saying bad form and probably the worst, which led to the final warning and disagreeing with the client's desire to tithe and saying it's not the Bible and indeed saying the religious verses that were provided are actually referred to pagan practices and also saying I'm working my balls off in front of a high-level executive and his wife, both of whom said I don't want this guy in my account. That led to a final warning. Thereafter, there were three more instances of behavior where the wife of a client calls while a meeting's on and says get this guy out of my house. He's taken off that account. We have another client who had hundreds of... Excuse me. Yes. I'm constrained to ask the question. Yes. Get this guy out of my house? In essence, he's saying get this person out of my house, make him leave. Counsel, can I ask you a question? Of course. Relative to the argument that's made by your opponent as to complaints that were made. Yes. Does that somehow rise to the level of an implied refusal? No. In my view, no, Your Honor. And, indeed, the legislature could have had a third part. It could have said complaints made internally or repeated complaints. But it's not an implied refusal. He continued. The record shows he continued to use contact management. He continued to distribute material. He continued to attend meetings with wealth strategists. He continued to try to do his job. All in sum, we believe there's also the alternative argument that we believe is valid and which should be granted because summary judgment could have been granted on and should be also accepted by this court that his behaviors clearly led to his firing, not any complaints he made, and, indeed, the timing, which, again, there's an issue in the briefs about who said what when, Heinz, Behrens. What's very clear and what's undisputed is this. Mr. Heinz testified without dispute that he recommended, decided, that he wanted to terminate Mr. Sardega in November. The allegation that Mr. Sardega said, I'm going to the NSD, that occurred on December 5, 2004. So the recommendation, the decision in the manager's mind was made before then. So we believe that on both grounds, the statute being unambiguous and clearly not satisfied and the causation argument as well that this court should affirm the lower court. Thank you. Thank you, counsel. Mr. Gamberg. Excuse me, Your Honor. A couple comments. The issue that Mr. Jepson brought up, I have four affidavits signed by various clients that Mr. Heinz complained, said that these clients complained about Mr. Sardega, and this was one of the reasons that the bank says that they fired him. These affidavits in their part of the record indicate that they don't agree with Mr. Heinz's side of the story as to what Mr. Sardega supposedly did wrong. So that's why, in part, Judge Goldberg said that's a disputed issue of fact. What was the real reason that he got fired? And if I may also, Your Honor, a couple things that Mr. Jepson said. He's right, but he's not completely right. For example, on contact management, there were some changes made because Mr. Sardega complained about it, but not completely, so that the result was there were still people who had access to private information that they had no business for. Yes, there were some changes. They assuaged Mr. Sardega somewhat, but not completely. The same thing about the literature. They did make some changes, again, to assuage him, however, not to the satisfaction of Mr. Sardega. And the record indicates that, and there's disputed facts about that. Respectfully, we're not asking the court to expand anything about the Illinois whistleblowing statute. Your Honors, we're just respectfully asking that there be a definition of what refusal actually means. And there is no guide in the legislation, in the legislative notes. There's no court case, at least that I'm aware of, and I don't think Mr. Jepson or Judge Goldberg were aware of, about the real-life events that happen on the job. So, again, as I said before, and I'm sorry if I'm repeating myself, if you're working for an employer, your livelihood depends on it, and you continue, continue, continue, and continue to say you're doing something illegal, don't do it. I can't participate in it. Okay, that's okay, Mr. Sardega. I'll go check it out with legal. I'll go check it out with compliance. And he comes back and says, I've done that, and it's okay. You don't have to worry about it. But the truth is, the material issue of fact exists whether he in fact did it and whether or not he actually lied about doing it. And that's why we're saying Northern Trust should not be able to use that as a shield to protect themselves from the effects of the Illinois whistleblowing statute. The record is replete, and I don't have to bore you with the details about what Mr. Sardega complained about. And I don't know that it, I mean, Judge Goldberg saw that there were disputed issues of fact about that, and he only looked at, as far as this appeal is concerned, about what is the definition of refusal because he couldn't find one and we couldn't find one. And respectfully, we believe that what actually happened here, the definition of refusal should reflect the reality of what goes on in the workplace. And if someone constantly asks your boss, is this legal? Is it okay? Because I don't want to do it. The boss comes back and says it's okay. They shouldn't be able to quite frankly use that as a shield with impunity to avoid the effects of the Illinois whistleblowing statute. Thank you, Your Honor. Thank you very much. The hearing will be taken under advisement. We are adjourned. Thanks, folks.